**FILED**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

SEP -7 2021

CLERK, U S DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| TODD RICKS, | ) | Crim No. 1:06-cr-00206-LY-1 |
| | ) | |
| Movant, | ) | **MOTION FOR COMPASSIONATE** |
| | ) | **RELEASE PURSUANT TO 18** |
| v. | ) | **U.S.C. § 3582(C)(1)(A) AND THE** |
| | ) | **FIRST STEP ACT OF 2018** |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

COMES Movant, TODD RICKS ("Ricks"), appearing *pro se,* and respectfully moves the Court under 18 U.S.C. § 3582(c)(1)(A)(i) to modify his sentence and immediately release him to home confinement and a period of supervised release. The unprecedented threat of COVID-19 poses extraordinary risks to Ricks' health. The virus thrives in densely packed populations, and the FCI is ill-equipped to contain the pandemic and prevent COVID-19 from becoming a de facto death sentence for Ricks. Ricks' diagnosed medical conditions make him especially vulnerable to the deadly risks of COVID-19. Allowing Ricks to finish out his sentence at home is the only prudent response to the extraordinary and compelling circumstances created by the novel coronavirus.

1

# I. <u>JURISDICTION</u>

The district court's jurisdiction to correct or modify a defendant's sentence is limited to those specific circumstances enumerated by Congress in 18 U.S.C. § 3582. The scope of a proceeding under 18 U.S.C. § 3582(c)(2) in cases like this one is extremely limited. *Dillon v. United States*, 130 S.Ct. 2683, 2687(2010). It is black-letter law that a federal court generally "may not modify a term of imprisonment once it has been imposed." *Id.* However, Congress has allowed an exception to that rule "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission." 18 U.S.C. § 3582(c)(2); see also, *Freeman v. United States*, 131 S.Ct. 2685 (2011) (reciting standard for sentence modifications). Such defendants are entitled to move for retroactive modification of their sentences. *Dillon*, 130 S.Ct. at 2690–91.

# II. <u>PROCEDURAL HISTORY</u>

## A.   <u>Procedural Background</u>

On September 5, 2006, a grand jury sitting in the United States District Court for the Western District of Texas, Austin Division, returned a one (1) Count

2

Indictment charging Ricks. See Doc. 1.[1] Count 1 charged Ricks with Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1). *Id.*

On January 12, 2007, the government filed a Notice to Seek Enhancement of Sentence based on Ricks' prior felony convictions. See Doc. 31.

On September 4, 2007, a grand jury sitting in the United States District Court for the Western District of Texas, Austin Division, returned a three (3) Count Superseding Indictment charging Ricks. See Doc. 99. Count 1s charged Ricks with Felon in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). *Id.* Count 2s charged Ricks with Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1). *Id.* Count 3s charged Ricks with Maintaining a Drug Involved Premises - Aiding and Abetting, in violation of 21 U.S.C. § 856(a)(1). *Id.*

On December 3, 2007, a 3-day jury trial commenced, and on December 5, 2007, the jury found Ricks guilty of all counts as charged in the Superseding Indictment. See Doc. 138.

---

[1]

"Doc." refers to the Docket Report in the United States District Court for the Western District of Texas, Austin Division in Criminal No. 1:06-cr-00206-LY-1, which is immediately followed by the Docket Entry Number. "CvDoc." refers to the Docket Report in the United States District Court for the Western District of Texas, Austin Division in Civil No. 1:19-cv-01041-LY-ML, which is immediately followed by the Docket Entry Number."PSR" refers to the Presentence Report in this case, which is immediately followed by the paragraph ("¶") number.

On March 5, 2008, Ricks was sentenced to a total term of 300 months' imprisonment, 3 years Supervised Release, no fine or restitution, and a Mandatory Special Assessment Fee of $300. See Docs. 146, 155.

On March 6, 2008, Ricks timely filed a Notice of Appeal. See Doc. 148. On January 29, 2009, the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit") issued an Order affirming the District Court Judgment. See Doc. 188.

On April 1, 2009, Ricks filed a Petition for Writ of Certiorari, which the U.S. Supreme Court denied on May 26, 2009.

On May 24, 2010, Ricks filed a Motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion"). See Doc. 196. On September 25, 2013, the Court issued an Order denying Ricks' § 2255 Motion. See Doc. 231.

On October 17, 2013, Ricks filed a Notice of Appeal re: denial of his § 2255 Motion, which the Fifth Circuit dismissed on May 19, 2014. See Docs. 232, 243.

On June 29, 2016, Ricks filed his second § 2255 Motion, but was denied on May 1, 2017. See Docs. 247, 256.

On October 24, 2019, Ricks filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241 ("2241 Petition"), which was dismissed on January 7, 2021. See CvDocs. 1, 21, 22.

**B.**   **Statement of the Relevant Facts**

1.   Offense Conduct

The following information is a compilation of information received from the

investigative agents from the Drug Enforcement Administration (DEA), Bureau of

Alcohol, Tobacco, Firearms and Explosives deputies from the McCulloch County

Sheriff's Department (MCSD) and Tom Green Sheriff's Office (TGSD), Texas

Rangers, Texas Parks and Wildlife, Texas Department of Public Safety (DPS),

testimony during trial, and the Probation Office's independent investigation:

> In June 22, 2006, investigative officers received information from a
> Cooperating Individual (CI) that methamphetamine was being possessed
> and concealed by "Debbie" and "Todd" inside a private residence in
> Brady, Texas. Investigators had previously received information
> regarding the residence's involvement with methamphetamine. It was
> determined that the property had two residences and three metal barns.
> A controlled purchase of a limited amount of methamphetamine was
> made from the smaller residence. As a result of the investigation, a
> search warrant for the residence at Private Road 574, House #163, in
> Brady, was obtained.

> On June 26, 2006, members of the San Angelo Area Narcotics Office,
> Texas Rangers, Texas Parks and Wildlife, MCSD, and TGSD executed
> a search warrant at the property, specifically the smaller residence,
> which is referred to as the guest house. Upon arrival, law enforcement
> officers located Todd Mitchell Ricks exiting one of the barns. Deborah
> Mueller ("Mueller") was observed walking on the side porch of the
> guest house. Both Ricks and Mueller were secured.

> During the search of guest house, officers found methamphetamine in
> a variety of locations, a set of digital scales, ingredients and the

5

remnants for a methamphetamine cook (i.e. charcoal lighter fluid, iodine, Pseudoephedrine, Ephedrine, and red phosphorus). Investigative officers discovered the inactive Clandestine Laboratory in the kitchen area of the guest house, where both Ricks and Mueller had been residing. It has been determined that the "lab" utilized plastic milk bottles, funnels, Coke/soda glass bottles and mason jars. During the search of the guest house, officers discovered the ingredients for methamphetamine, the remnants of a methamphetamine cook and a loaded firearm. The room which contained the loaded firearm, a Lorcin, model L-380, .380 caliber pistol, SN 204941, was occupied by Ricks, who was known to be a multi-convicted felon. The loaded firearm was located in a drawer of a small table next to the left side of the bed. A brown leather holster for the firearm was also found. Methamphetamine was found under the bed and throughout the bedroom. In the kitchen, under the sink, investigators found a green bottle containing a methamphetamine liquid. Laboratory analysis determined that the 375 grams of liquid contained methamphetamine. A quantitative analysis as to the percent of methamphetamine was not provided. At this time it is not known if this liquid was seized prior to the completion of the "cook" or was the waste product of the "cook." What was considered as a drug ledger was also seized from the guest house. A total of 378.2 grams of solutions or mixtures containing methamphetamine and 220.03 grams of solutions or mixtures of Ephedrine/Pseudoephedrine were seized from the guest house.

Michelle McAdams ("McAdams") and Chad Kleinmeyer ("Kleinmeyer") gave their consent for the main residence to be searched. In this residence, a total of .47 gams of methamphetamine and a set of digital scales were found.

Ricks, Mueller, and McAdams were arrested. Kleinmeyer was released without incident.

Mueller was interviewed by investigative agents and admitted to cooking methamphetamine and to being the sole methamphetamine cook. Ricks was also interviewed wherein he attempted to deny any knowledge of the methamphetamine being manufactured in the

residence. However, he admitted to the use of methamphetamine and the use of methamphetamine with Mueller in the guest house. Ricks also admitted to knowledge of the weapon seized. He provided further details regarding the firearm and stated that the shell would hang up every time it shot. Ricks further admitted to firing the pistol on three or four different occasions. He stated that he had used it to kill a rattlesnake.

McAdams was also interviewed and admitted that the methamphetamine found in the main house belonged to her and was given to her by Mueller several days prior. Kleinmeyer also provided a statement, wherein he states that "in April 2006, Mueller and Ricks would bring methamphetamine to the main house to Kleinmeyer and McAdams."

The criminal investigation and trial testimony determined that Ricks and Mueller participated in methamphetamine "cooks" at least once a week. However, the amount of methamphetamine produced per cook is not known. It has been reported that Ricks and Mueller had been involved in manufacturing methamphetamine for approximately six months prior to Ricks' arrest and that the guest house where they lived was where the manufacturing occurred. The investigation also determined that Ricks and Mueller used two methods of manufacturing methamphetamine: red phosphorous and anhydrous. In a post arrest statement, Mueller advised that she could produce two gams of methamphetamine when she used five grams of Ephedrine. However, Mueller also stated she manufactured methamphetamine for her own personal use and did not distribute.

ATF agents determined that the firearm had previously traveled in interstate and/or foreign commerce and was manufactured outside of the State of Texas.

See PSR ¶¶ 5-14.

2.    Trial Proceeding

On December 3, 2007, a 3-day jury trial commenced before Judge Lee Yeakel.Two days later, the jury found Ricks guilty of all counts as charged in the

Superseding Indictment. See Doc. 138. The case was referred to the U.S. Probation Office for the preparation of the PSR.

### 3.    Presentence Report Recommendations

On February 26, 2007, the Probation Office prepared Ricks' PSR (revised on January 29, 2008), using the Guidelines Manual effective November 1, 2007. See PSR ¶ 20. On Counts 1s and 3s, Ricks' Base Offense Level is 24, pursuant to USSG § 2K2.1(a)(2), because Ricks committed the instant offense subsequent to obtaining at least two scoreable convictions for a crime of violence, to wit: Burglary of Habitation. See PSR ¶ 21. On Count 2s, Ricks' Base Offense Level is 12, because the instant offense involved less than 2.5 grams of methamphetamine, pursuant to USSG § 2D1.4(a)(1). See PSR ¶ 29. However, Ricks was subjected to an enhanced sentence under the provisions of 18 U.S.C. § 924(e), he was deemed to be an Armed Career Criminal. Pursuant to USSG § 4B1.4(b)(3)(B), the offense level for an armed career criminal is 33 (otherwise) as Ricks did not use or possess the firearm in connection with either crime of violence, as defined in USSG § 4B1.2(a), or a controlled substance, as defined in USSG § 4B1.2(b). See PSR ¶ 36. Absent any enhancements and reductions, Ricks' Total Offense Level is 33. See PSR ¶ 38. Ricks' criminal history points totalled to 19, establishing a Criminal History Category of VI. Moreover, pursuant to USSG § 4B1.4(b)(3)(c)(2), the criminal history category for

an Armed Career Criminal is VI. Based upon a Total Offense Level of 33 and a Criminal History Category VI, the guideline range for imprisonment is 235 to 293 months. USSG Chapter 5, Part A. However, in Count 1s, because Ricks is subject to an enhanced sentence under the provisions of 18 U.S.C. § 924(e), he is statutorily exposed to a sentence of no less than 180 months (15 years) and up to Life imprisonment. As for Count 2s, as the defendant is a career offender, the guideline range for imprisonment is 360 months to Life, pursuant to USSG § 4B1.1(c)(3). As for Count 3s, as there is a statutory maximum of 20 years, Ricks has a guideline range of 235 to 240 months, pursuant to USSG § 5G1.1(c)(1). See PSR ¶ 60.

    4.    <u>Sentencing Proceeding</u>

On March 5, 2008, a Sentencing Hearing was held before Judge Lee Yeakel. See Doc. 146. The Court imposed a term of imprisonment of: 240 months' imprisonment on each of Count 1s and 3s to run concurrently; and 60 months' imprisonment on Count 2s to run consecutively to Counts 1s and 3s, for a total term of 300 months' imprisonment. See Doc. 155. Followed by 3 years supervised release on Count 1s, 2s, and 3s, to run concurrently. *Id*. The Court also ordered payment of a Mandatory Special Assessment Fee of $300. *Id*. A timely Notice of Appeal was filed on March 6, 2008. See Doc. 148.

    5.    <u>Appellate Proceeding</u>

On Appeal, Ricks contended that: (1) there was insufficient evidence to show that he possessed a firearm in furtherance of a drug trafficking crime under 18 U.S.C. § 924(c)(1); (2) there was insufficient evidence to prove that he "maintained" a house for the purpose of manufacturing methamphetamine under 21 U.S.C. § 856; and (3) he was denied the effective assistance of counsel because his attorney failed to move for acquittal. On January 5, 2009, the Fifth Circuit rejected these claims and affirmed Ricks judgment and conviction. See *United States v. Ricks*, 304 F. App'x 343 (5th Cir. 2009). On May 26, 2009, the United States Supreme Court denied Ricks' petition for certiorari. See *United States v. Ricks*, 129 S.Ct. 2446 (2009).

6.    Postconviction Proceeding

On May 24, 2010, Ricks filed a § 2255 Motion. Subsequently, on September 25, 2013, the Court issued an Order denying Ricks' § 2255 Motion. On October 17, 2013, Ricks filed a Notice of Appeal, but the Fifth Circuit dismissed Ricks' appeal on May 19, 2014.

After Ricks' direct appeal was final, the Supreme Court ruled in *Johnson v. United States*, 135 S. Ct. 2551 (2015), that the ACCA's residual clause was unconstitutionally vague, and that "imposing an increased sentence under the residual clause of the Armed Career Criminal Act violates the Constitution's guarantee of due process." *Id.* at 2563. On June 29, 2016, Ricks filed a § 2255 motion premised upon

10

the Supreme Court's holding in *Johnson*, made retroactive by the Supreme Court's holding in *Welch v. United States*, 136 5. Ct. 1257 (2016). In his motion, Ricks argues that his sentence was improperly enhanced under the ACCA because the Texas burglary of a habitation convictions used to support the enhancement no longer qualify as violent felonies in light of *Johnson*. On August 5, 2016, the Fifth Circuit tentatively granted Ricks permission to file a successive § 2255 motion pending the district court's review of whether Ricks satisfied the requirements for filing a successive motion. See Order of August 5, 2016 [Doc. 246]. However, on May 1, 2017, the Court denied Ricks' successive § 2255 motion. See Doc. 256.

## III. DISCUSSION

As a preliminary matter, Ricks respectfully requests that this Court be mindful that *pro se* pleadings are to be construed liberally. See *United States v. Kayode*, 777 F.3d 719 (5th Cir. 2014) ("*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed."); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (same); and *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (same).

### A.   Federal Courts Have the Jurisdiction and Power to Reduce An Existing Sentence

This Court has the power to adjust Ricks' sentence. District courts no longer need a motion from the Bureau of Prisons to resentence a federal prisoner under the

compassionate release provisions of 18 U.S.C. §3582(c)(1)(A)(i). A district court may now resentence if the inmate files a motion after exhausting administrative remedies. The reasons that can justify resentencing are not limited to medical, age, or family circumstances. A district court may resentence if the inmate demonstrates extraordinary and compelling reasons for a sentence reduction. Such reasons are present in this case.

### 1.   Historical Framework

Congress first enacted the compassionate release provisions in 18 U.S.C. § 3582 as part of the Comprehensive Crime Control Act of 1984. That legislation provided that a district court could modify a final term of imprisonment when extraordinary and compelling reasons warrant such a reduction. 18 U.S.C. §3582(c)(1)(A)(i). In 1984, this provision was conditioned on the Bureau of Prisons (BOP) filing a motion in the sentencing court. Absent a motion by the BOP, a sentencing court had no jurisdiction to modify an inmate's sentence. Congress did not define what constitutes an "extraordinary and compelling reason," but the legislative history recognized that the statute was intended, in part, to abolish and replace federal parole. Rather than have the parole board review for rehabilitation only, Congress authorized review for changed circumstances:

> The Committee believes that there may be unusual cases in which an
> eventual reduction in the length of a term of imprisonment is justified by

changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term on imprisonment. S. Rep. No. 98-225 at 55-56 (1983).

18 U.S.C. § 3582 acts as a "safety valve" for the "modification of sentences" that would previously have been addressed through the former parole system. *Id*. at 121. The provision was intended "to assure the availability of specific review and reduction of a term of imprisonment for "extraordinary and compelling reasons" and [would allow courts] to respond to changes in the guidelines." *Id*. Thus, sentencing courts have the power to modify sentences for extraordinary and compelling reasons.

2.    Section 3582(c)(1)(A) is Not Limited To Medical, Elderly or Childcare Circumstances

Congress initially delegated the responsibility for determining what constitutes "extraordinary and compelling reasons" to the United States Sentencing Commission. 28 U.S.C. § 994(t) ("The Commission…shall describe what should be considered "extraordinary and compelling reasons" for sentence reduction, including the criteria to be applied and a list of specific examples." Congress provided one limitation to that authority: "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). Rehabilitation could, however, be considered with other reasons to justify a reduction.

13

In 2007, the Sentencing Commission defined "extraordinary and compelling reasons" as follows:

(A)     Extraordinary and Compelling Reasons - Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the following circumstances:

(i)     The defendant is suffering from a terminal illness.

(ii)    The defendant is suffering from a permanent physical or medical condition, or is experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self care within the environment of a correctional facility and for which conventional treatment promises no substantial improvement.

(iii)   The death or incapacitation of the defendant's only family member capable of caring for the defendant's minor child or minor children.

(iv)    As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason for purposes of subdivision (1)(A). USSG §1B1.13, Application Note 1.

As we will see, with the passage of The First Step Act, subparagraph (iv) is no longer limited by what the BOP decides is extraordinary and compelling.

Historically, the BOP rarely filed motions under § 3582(c)(1)(A), even when the inmates met the objective criteria for modification. See U.S. Dep't of Justice Office of the Inspector General, The Federal Bureau of Prisons Compassionate Release Program (Apr. 2013). The Office of the Inspector General also found that the

BOP failed to provide adequate guidance to staff on the criteria for compassionate release, failed to set time lines for review of compassionate release requests, failed to create formal procedures for informing prisoners about compassionate release, and failed to generate a system for tracking compassionate release requests. *Id*. at i-iv.

Congress heard those complaints and in late 2018 enacted The First Step Act.

### 3.    The First Step Act

The First Step Act, P.L. 115-391, 132 Stat. 5194, at (Dec. 21, 2018), among other things, transformed the process for compassionate release. *Id*. at §603. Now, instead of depending upon the BOP to determine an inmate's eligibility for extraordinary and compelling reasons and the filing of a motion by the BOP, a court can resentence "upon motion of the defendant." A defendant can file an appropriate motion if the he or she has exhausted all administrative remedies or "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The purpose and effect of this provision is to give federal courts the ability to hear and resentence a defendant even in the absence of a BOP motion. Congress labeled this change "Increasing the Use and Transparency of Compassionate Release." 164 Cong. Rec. H10346, H10358 (2018). Senator Cardin noted in the record that the bill "expands compassionate release under the Second Chance Act and expedites compassionate release

applications." 164 Cong. R. 199 at S7774 (Dec. 18, 2018). In the House, Representative Nadler noted that the First Step Act includes "a number of very positive changes, such as … improving application of compassionate release, and providing other measures to improve the welfare of federal inmates." 164 Cong. R. H10346-04 (Dec. 20, 2018).

Once an inmate has pursued administrative remedies through the BOP, upon his or her motion, the sentencing court has jurisdiction and the authority to reduce a sentence if it finds "extraordinary and compelling reasons" to warrant a reduction. Judicial authority is no longer limited to cases that have the approval of the BOP.

### 4.   Ricks Has Exhausted Administrative Remedies

A motion by an inmate can be filed in the district court after (1) the inmate has made the request to the Warden, and (2) either the request was denied or 30 days have lapsed from the receipt of the request, whichever is sooner. First Step Act of 2018, section 803(b), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018).

Ricks filed a Motion for Compassionate Release to the Warden, FCI Bastrop. Up to this date, Ricks has not received any decision yet as to his motion to reduce his sentence. Because 30 days have passed and the BOP failed to file a motion on Ricks' behalf, exhaustion of administrative remedies is not an issue in this case. See 18 U.S.C. § 3582(c)(1)(A).

16

## B.    Ricks' Current Conditions of Confinement and Health Conditions

Ricks, age 55, suffers from incurable, progressive disease, from which Ricks will never recover, to wit: Diabetes, Hypertension, Prostate Disease, Heart Disease, and Chronic Kidney Disease. Ricks also suffers from elevated triglyceride level, bilateral lower extremity edema, has history of hepatitis C, cirrhosis, history of allergy to intravenous iodine contrast, and difficulty breathing. See Exhibit 1.

### Facts:

*Diabetes*. Diabetes is a serious condition that causes higher than normal blood sugar levels. Diabetes occurs when your body cannot make or effectively use its own insulin, a hormone made by special cells in the pancreas called islets (eye-lets). Insulin serves as a "key" to open your cells, to allow the sugar (glucose) from the food you eat to enter. Then, your body uses that glucose for energy.

But with diabetes, several major things can go wrong to cause diabetes. Type 1 and type 2 diabetes are the most common forms of the disease, but there are also other kinds, such as gestational diabetes, which occurs during pregnancy, as well as other forms.

*Hypertension*. Hypertension is another name for high blood pressure. It can lead to severe health complications and increase the risk of heart disease, stroke, and sometimes death.

Blood pressure is the force that a person's blood exerts against the walls of their blood vessels. This pressure depends on the resistance of the blood vessels and how hard the heart has to work.

Hypertension is a primary risk factor for cardiovascular disease, including stroke, heart attack, heart failure, and aneurysm. Keeping blood pressure under

17

control is vital for preserving health and reducing the risk of these dangerous conditions.

***Heart Disease***. Heart disease describes a range of conditions that affect your heart. Heart diseases include:
- Blood vessel disease, such as coronary artery disease
- Heart rhythm problems (arrhythmias)
- Heart defects you're born with (congenital heart defects)
- Heart valve disease
- Disease of the heart muscle
- Heart infection

**Risk factors**

Risk factors for developing heart disease include:
- Age. Growing older increases your risk of damaged and narrowed arteries and a weakened or thickened heart muscle.
- Sex. Men are generally at greater risk of heart disease. The risk for women increases after menopause.
- Family history. A family history of heart disease increases your risk of coronary artery disease, especially if a parent developed it at an early age (before age 55 for a male relative, such as your brother or father, and 65 for a female relative, such as your mother or sister).
- Smoking. Nicotine tightens your blood vessels, and carbon monoxide can damage their inner lining, making them more susceptible to atherosclerosis. Heart attacks are more common in smokers than in nonsmokers.
- Poor diet. A diet that's high in fat, salt, sugar and cholesterol can contribute to the development of heart disease.
- High blood pressure. Uncontrolled high blood pressure can result in hardening and thickening of your arteries, narrowing the vessels through which blood flows.
- High blood cholesterol levels. High levels of cholesterol in your blood can increase the risk of plaque formation and atherosclerosis.
- Diabetes. Diabetes increases your risk of heart disease. Both conditions share similar risk factors, such as obesity and high blood pressure.
- Obesity. Excess weight typically worsens other heart disease risk factors.

18

- Physical inactivity. Lack of exercise also is associated with many forms of heart disease and some of its other risk factors as well.
- Stress. Unrelieved stress may damage your arteries and worsen other risk factors for heart disease.
- Poor dental health. It's important to brush and floss your teeth and gums often, and have regular dental checkups. If your teeth and gums aren't healthy, germs can enter your bloodstream and travel to your heart, causing endocarditis.

**Complications**

Complications of heart disease include:

- Heart failure. One of the most common complications of heart disease, heart failure occurs when your heart can't pump enough blood to meet your body's needs. Heart failure can result from many forms of heart disease, including heart defects, cardiovascular disease, valvular heart disease, heart infections or cardiomyopathy.
- Heart attack. A blood clot blocking the blood flow through a blood vessel that feeds the heart causes a heart attack, possibly damaging or destroying a part of the heart muscle. Atherosclerosis can cause a heart attack.
- Stroke. The risk factors that lead to cardiovascular disease can also lead to an ischemic stroke, which happens when the arteries to your brain are narrowed or blocked so that too little blood reaches your brain. A stroke is a medical emergency — brain tissue begins to die within just a few minutes of a stroke.
- Aneurysm. A serious complication that can occur anywhere in your body, an aneurysm is a bulge in the wall of your artery. If an aneurysm bursts, you may face life-threatening internal bleeding.
- Peripheral artery disease. When you develop peripheral artery disease, your extremities — usually your legs — don't receive enough blood flow. This causes symptoms, most notably leg pain when walking (claudication). Atherosclerosis also can lead to peripheral artery disease.
- Sudden cardiac arrest. Sudden cardiac arrest is the sudden, unexpected loss of heart function, breathing and consciousness, often caused by an arrhythmia. Sudden cardiac arrest is a medical emergency. If not treated immediately, it results in sudden cardiac death.

***Chronic Kidney Disease***. Chronic kidney disease, also called chronic kidney failure, describes the gradual loss of kidney function. Your kidneys filter wastes and excess fluids from your blood, which are then excreted in your urine. When chronic kidney disease reaches an advanced stage, dangerous levels of fluid, electrolytes and wastes can build up in your body.

Treatment for chronic kidney disease focuses on slowing the progression of the kidney damage, usually by controlling the underlying cause. Chronic kidney disease can progress to end-stage kidney failure, which is fatal without artificial filtering (dialysis) or a kidney transplant.

Diseases and conditions that cause chronic kidney disease include:
- Type 1 or type 2 diabetes
- High blood pressure
- Glomerulonephritis, an inflammation of the kidney's filtering units (glomeruli)
- Interstitial nephritis, an inflammation of the kidney's tubules and surrounding structures
- Polycystic kidney disease
- Prolonged obstruction of the urinary tract, from conditions such as enlarged prostate, kidney stones and some cancers
- Vesicoureteral reflux, a condition that causes urine to back up into your kidneys
- Recurrent kidney infection, also called pyelonephritis

**Risk factors**
Factors that may increase your risk of chronic kidney disease include:
- Diabetes
- High blood pressure
- Heart and blood vessel (cardiovascular) disease
- Smoking
- Obesity
- Being African-American, Native American or Asian-American
- Family history of kidney disease
- Abnormal kidney structure
- Older age

**Complications**

Chronic kidney disease can affect almost every part of your body. Potential complications may include:

- Fluid retention, which could lead to swelling in your arms and legs, high blood pressure, or fluid in your lungs (pulmonary edema)
- A sudden rise in potassium levels in your blood (hyperkalemia), which could impair your heart's ability to function and may be life-threatening
- Heart and blood vessel (cardiovascular) disease
- Weak bones and an increased risk of bone fractures
- Anemia
- Decreased sex drive, erectile dysfunction or reduced fertility
- Damage to your central nervous system, which can cause difficulty concentrating, personality changes or seizures
- Decreased immune response, which makes you more vulnerable to infection
- Pericarditis, an inflammation of the saclike membrane that envelops your heart (pericardium)
- Pregnancy complications that carry risks for the mother and the developing fetus
- Irreversible damage to your kidneys (end-stage kidney disease), eventually requiring either dialysis or a kidney transplant for survival

COVID-19 has infected hundreds of prisoners and staff in city jails, state prisons and federal prisons.

New York, California and Ohio were among the first to release incarcerated people. Other states have followed, saying it is the only way to protect prisoners, correctional workers, their families and the broader community.

21

Jails and prisons often lack basic hygiene products, have minimal health care services and are overcrowded. Social distancing is nearly impossible except in solitary confinement, but that poses its own dangers to mental and physical health.

While there is absolutely no evidence to support that any person is more or less likely to be infected [with COVID-19] based on existing medical conditions, Ricks' argues that, first, prisoners experience exponentially higher rates of COVID-19 than the general population. As of June 2020, "[t]he COVID-19 case rate for prisoners was 5.5 times higher than the US population case rate."[2] Second, and more critically, older individuals and individuals with chronic medical conditions are at greater risk of hospitalization and death from COVID-19. For example, the CDC reports that persons aged 40 to 49 are 15 times more likely to be hospitalized and 130 times more likely to die from COVID-19 compared to persons aged 18 to 29 and younger.[3] In other words, Ricks does not only contend that his health conditions increase his risk of getting COVID-19; but also, he contends that those conditions greatly increase the risk that, if contracted, his COVID-19 infection would be severe or even deadly.

---

[2]

Brendan Saloner, *et al.*, *COVID-19 Cases and Deaths in Federal and State Prisons*, J. of the Am. Med. Ass'n (July 8, 2020), https://jamanetwork.com/journals/jama/fullarticle/2768249.

[3]

*Hospitalizations & Death by Age*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html (last updated May 14, 2021).

*BOP Amid Covid-19*

One consequence of overcrowding is that prison officials have a difficult time providing adequate health care.

In 2011 the U.S. Supreme Court ruled that overcrowding undermined health care in California's prisons, causing avoidable deaths. The justices upheld a lower court's finding that this caused an "unconscionable degree of suffering" in violation of the Eighth Amendment's prohibition on cruel and unusual punishment.

Amid a worldwide pandemic, such conditions are treacherous. Some of the worst COVID-19 outbreaks in U.S. prisons and jails are in places – like Louisiana and Chicago – whose prison health systems have been ruled unconstitutionally inadequate. Criminologists and advocates say many more people should be released from jails and prison, even some convicted of violent crimes if they have underlying health conditions.

The decision to release prisoners cannot be made lightly. But arguments against it discount a reality recognized over two centuries ago: The health of prisoners and communities are inextricably linked. Coronavirus confirms that prison walls do not, in fact, separate the welfare of those on the inside from those on the outside.

**C.    Ricks Has "Extraordinary and Compelling Reasons" For Compassionate Release**

The principles of Compassionate Release allow for Ricks' early release. As discussed above, the principles for release are no longer limited to BOP guidelines; federal courts have the power to determine what constitutes extraordinary and compelling circumstances.

### 1.   COVID-19 Is a Public Health Disaster That Threatens Vulnerable Incarcerated Persons like Ricks.

The COVID-19 pandemic continues to roil the United States. As of April 29, 2021, the BOP has 126,247 federal inmates in BOP-managed institutions and 13,636 in community-based facilities. The BOP staff complement is approximately 36,000. There are 352 federal inmates and 815 BOP staff who have confirmed positive test results for COVID-19 nationwide. There have been 234 federal inmate deaths and 4 BOP staff member deaths attributed to COVID-19 disease. See https://www.bop.gov/coronavirus/ (last accessed April 29, 2021). Bottom line, Federal facilities are not immune.

Conditions of confinement create an ideal environment for the transmission of highly contagious diseases like COVID-19. Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons. Inmates share small cells, eat together and use the same bathrooms and sinks. . . . . They are not given tissues or sufficient hygiene supplies"); Joseph A.

Bick (2007). *Infection Control in Jails and Prisons*. Clinical Infectious Diseases 45(8):1047-1055, at https://academic.oup.com/cid/article/45/8/1047/344842 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"). BOP employees are complaining that they lack masks and gloves, hand sanitizer, and even soap.

"The [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . . We don't know who's infected." *Manrique*, 2020 WL 1307109, at *1.10

Indeed, as the Second Circuit recently observed, present information about the COVID-19 epidemic and the BOPs' prior failings in 2019 to adequately protect detainees and allow them access to counsel and their families following a fire and power outages suggest that the virus' impact will likely be "grave and enduring." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, No. 19-1778, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020).

        2.      <u>Sanford's Vulnerability to COVID-19 Due to His High Medical Risk Is an Extraordinary and Compelling Reason That Warrants a Sentence Reduction.</u>

25

Sanford is particularly vulnerable to COVID-19 because of his diabetes, hypertension, heart disease, and chronic kidney disease. As the COVID-19 pandemic continues, it potentially poses a particular issue for older people and people with pre-existing medical conditions (such as serious heart condition, lung disease, and autoimmune disease) appear to be more vulnerable to becoming severely ill with the COVID-19 virus.

*Lung Problems, Including Asthma*
COVID-19 targets the lungs, so you're more likely to develop severe symptoms if you have preexisting lung problems, such as: Moderate to severe asthma, Chronic obstructive pulmonary disease (COPD), Lung cancer, Cystic fibrosis, Pulmonary fibrosis. In addition to being an asthma trigger, smoking or vaping can harm your lungs and inhibit your immune system, which increases the risk of serious complications with COVID-19.

*Heart Disease, Diabetes and Obesity*
People with diabetes, heart disease, high blood pressure or severe obesity are more likely to experience dangerous symptoms if infected with COVID-19. This may be of particular concern in the United States, which has seen increasing rates of obesity and diabetes over the years.

Obesity and diabetes both reduce the efficiency of a person's immune system. Diabetes increases the risk of infections in general. This risk can be reduced by keeping blood sugar levels controlled and continuing your diabetes medications and insulin. Your risk of serious illness may also be higher if you have heart diseases such as cardiomyopathy, pulmonary hypertension, congenital heart disease, heart failure or coronary artery disease.

*How SARS-COV-2 Causes Disease and Death in COVID-19*
"You'd think underlying lung problems or immune system problems will be the greatest risk," says Dr. Levitt. "But it seems the biggest risk

factors have been hypertension, diabetes and obesity." That has led many scientists to suspect that the profound inflammation seen in severe cases of COVID-19 may be yet another problem linked to SARS-COV-2's fondness for ACE2. People with diabetes, hypertension and heart disease have more ACE2 on their cells as a response to the higher levels of inflammation that come with their condition; ACE2 has an anti-inflammatory effect. When SARS-COV-2 sticks to ACE2 and reduces its ability to do its job, the underlying inflammation gets worse.

When inflammation gets completely out of control the body enters what is called a cytokine storm. Such storms drive the most severe outcomes for COVID-19, including multi-organ failure. There is thus an obvious role for anti-inflammatory drugs. But knowing when to administer them is hard. Go too late, and the storm will be unstoppable; go too early, and you may dampen down an immune response that is turning the tide. A recent article in the Lancet suggests that it would help if COVID-19 patients were routinely screened for hyper-inflammation to help identify those who might benefit from anti-inflammatory drugs. But not everyone is convinced today's drugs have much to offer. "We tried [a range of anti-inflammatory treatment] and it actually didn't work," says Rajnish Jaiswal, who has been working on the front line of COVID-19 treatment at New York's Metropolitan Hospital.

https://www.economist.com/briefing/2020/06/06/how-sars-cov-2-causes-disease-and-death-in-covid-19.

*Delta Plus Variant of COVID-19*

The latest coronavirus variant has spread to about a dozen countries—including India, the U.S., and the U.K.—while scientists scramble to figure out if the strain is more deadly or transmissible.

A new variant of the coronavirus has emerged, and scientists are working to figure out if it is more dangerous than its infamous cousin, the Delta variant, which has killed hundreds of thousands of people in India and is fast becoming the dominant variant around the world. The state of Maharashtra, India, which was hit hard by the devastating

second wave of COVID-19, has now reimposed lockdowns due to rising fears about this new variant, dubbed Delta Plus (which is not an official designation).

Delta Plus differs just slightly from Delta—the predominant strain in India and the United Kingdom—which is more infectious and is thought to cause more hospitalizations than previous strains. Existing vaccines are effective against Delta, but only when people are fully vaccinated.

See https://www.nationalgeographic.com/science/article/how-dangerous-is-the-new-delta-plus- variant--heres-what-we-know.

The dangerous Delta variant of the coronavirus is spreading so quickly in the United States that it's likely the mutant strain will become predominant in the nation within weeks, according to federal health officials and a new analysis.

At a White House briefing on COVID-19 on Tuesday, Dr. Anthony Fauci of the National Institutes of Health said 20.6% of new cases in the U.S. are due to the Delta variant. And other scientists tracking the variant say it is on track to become the dominant virus variant in the U.S.

"The Delta variant is currently the greatest threat in the U.S. to our attempt to eliminate COVID-19," Fauci said. He noted that the proportion of infections being caused by the variant is doubling every two weeks.

The variant, first identified in India, is the most contagious yet and, among those not yet vaccinated, may trigger serious illness in more people than other variants do, he said.

See https://www.npr.org/sections/health-shots/2021/06/22/1008859705/delta-variant-coronavirus-unvaccinated-u-s-covid-surge.

Due to overcrowding, lack of resources, and little access to medical care, incarcerated people have been at high risk for contracting COVID-19. Now, as the

28

highly transmissible Delta variant circulates widely, they may be even more susceptible to the virus.

**Josh Manson**, a researcher at the UCLA Law COVID Behind Bars Data Project, tells Verywell that there have been few efforts to curb the Delta variant and COVID-19 overall, making prisons deadly places for transmission. "When the pandemic first hit in March 2020, prisons were not taking the situation seriously," Manson says. "We know that it's even more transmissible than it was the first time a year and a half ago. We've seen thousands of people die in jails and prisons."

So far, at least 2,718 people incarcerated in state and federal prisons, including ICE custody, have died of COVID-19, making prisons a lethal setting during the pandemic.[4]

According to Manson, the current death count is an underestimate. "There's evidence emerging that the counts that have been recorded are actually undercounted," Manson explains. "So we don't even know the true totals of how many people died."

### For Prisoners, Vaccine Trial Participation May Do More Harm Than Good

Early on, the Centers for Disease Control and Prevention (CDC) identified

---

[4]

UCLA Law COVID Behind Bars Data Project. National aggregate counts. Updated July 6, 2021.

people in prison as vulnerable to COVID-19 infection. At the height of the pandemic, public health practitioners and civil rights organizations demanded the release of people in prison due to overcrowding and the lack of access to medical care.[5]

According to the Prison Policy Initiative, the Federal Bureau of Prisons released over 24,000 people over the course of the pandemic, with sentences to be served in home confinement.[6]

While some prisoners were released, a portion of the releases were deathbed releases—or the release of incarcerated individuals who are near death.

### *Delta Variant Is Creating a Web of Regional COVID-19 Epidemics*

"It's basically just taking the handcuffs off while they're [incarcerated people] on a ventilator and then saying, 'oh, you're free,' and then they die," Manson explains.

Deathbed releases have made it difficult to determine the number of deaths that occurred within prisons, Manson adds. In fact, the New York Times reported this week that dozens of these cases around the country have been excluded from official counts.

---

[5]

ACLU. ACLU demands the release from prisons and jails of communities vulnerable to COVID-19. Updated March 18, 2020.

[6]

Prison Policy Initiative. The most significant criminal justice policy changes from the COVID-19 pandemic. Updated May 18, 2021.

### *Collecting COVID-19 Data From Prisons Remains Challenging*

Data collection within prisons has been no easy feat, according to Manson.

**Homer Venters, MD**, epidemiologist, clinical associate professor at New York University's College of Global Public Health, and former chief medical officer for the New York City jail system, tells Verywell that to track and promote better health outcomes, he believes data should be collected by the CDC and state departments of health.

"Some of the recommendations that I really advocated for in the Biden Harris task force have explicitly called on the CDC and the state department's of health to become much more involved in tracking health outcomes," Venters says.

### *Study: COVID-19 Crowdfunding Campaigns Benefited Privileged Groups Most*

"All health data from prisons right now is really all over the place," Manson adds.

For example, prison systems report vaccination differently. Some prisons have reported the number of incarcerated people who have received only the first dose, while other systems have reported the number of staff and incarcerated people who received both doses.

### *Vaccination Rates for Staff Lags Behind*

Manson says that vaccine efforts within prisons aren't as robust as they should be. While 446,079 incarcerated individuals (or 66%) have received at least one dose of the COVID-19 vaccine, carceral facility staff are vaccinated at much lower rates.4

Across all U.S. prisons, only 110,946 correctional staff (45%) have been vaccinated in comparison.[7] Venters says that low vaccination rates among carceral staff are a national problem.

"You'll see that the vaccination rate for incarcerated people is higher than for staff," Manson says. "That is not because incarcerated people have had easier access, but because staff refusal rates have been high." Because the Delta variant is highly transmissible, staff can serve as transmitters of the virus if they are unvaccinated.

"When you have such an overcrowded facility, which these facilities are right now, it only takes one case," Manson says. "So if a member is not vaccinated, they can very easily transmit the virus."

### *Experts Say More Needs to Be Done to Curb Hesitancy*

According to Venters, the most basic strategies for curbing vaccine hesitancy—like addressing people's concerns about safety—are not being employed.

---

[7]

UCLA Law COVID Behind Bars Data Project. COVID-19 vaccines in carceral facilities. Updated 2021.

Incarcerated people have declined vaccinations because their questions about the vaccines were left unanswered, Venters says.

"Often behind bars, the way that the vaccine is offered is through these big mass events, there's very little attention to finding the people who have questions, and really sitting down and talking to them," Venters adds.

### Pfizer and Moderna COVID-19 Vaccines Could Produce Years of Immunity

These questions typically arise for people in prison who have complicated health problems. "We have this paradoxical situation where some of the sickest people who really just had a lot of normal, genuine questions about vaccinations remain unvaccinated because of the way in which the vaccine has been offered," Venters stresses.

For correctional officers, some have rejected the vaccine because they were worried about not having enough paid time off, Venters notes.

"Correctional settings decided they were going to give people five or 10 days of COVID off, and that would include if they got sick from COVID, or if they had a side effect of the vaccine," he adds. "But many correctional officers blew through that time a year ago when they got sick."

### WHO Urges Fully Vaccinated People to Wear Masks Due to Delta Variant Spread

Correctional officers expressed worry to Venters that if they experienced side effects, they wouldn't have any sick time, underscoring the financial concerns for carceral staff and their families. This suggests a need for policy change within the prison system, Venters says.

Regardless of a vaccine mandate, curbing the Delta variant will require engaging with carceral staff.

Hence, it is appropriate for Ricks to be released into an environment where he and his loved ones can control and direct his medical care. It is important for all of us to remember that convicted criminals are sent to prison as punishment—not for punishment. People who are severely debilitated or are in the midst of dying are usually no longer a threat to society, and there is not a compelling social advantage to keeping them in prison.

**Note:**   According to the Centers for Disease Control and Prevention ("CDC"), COVID-19 is a new disease and there is limited information regarding risk factors for severe disease. Based on currently available information and clinical expertise, older adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19.

a.   Based on what we know now, those at high-risk for severe illness from COVID-19 are:
   • People 60 years and older
   • People who live in a nursing home or long-term care facility

b.   People of all ages with underlying medical conditions, particularly if not well controlled, including:

34

- Cancer
- Chronic kidney disease
- Chronic lung diseases, including COPD (chronic obstructive pulmonary disease), asthma (moderate-to-severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension
- Dementia or other neurological conditions
- Diabetes (type 1 or type 2)
- Down syndrome
- Heart conditions (such as heart failure, coronary artery disease, cardiomyopathies or hypertension)
- HIV infection
- Immunocompromised state (weakened immune system)
- Liver disease
- Overweight and obesity
- Pregnancy
- Sickle cell disease or thalassemia
- Smoking, current or former
- Solid organ or blood stem cell transplant
- Stroke or cerebrovascular disease, which affects blood flow to the brain
- Substance use disorders

are the hallmark of those who are most endangered by the instant pandemic. These are "extraordinary and compelling reasons" for his release. See Note 1(A), § 1B1.13 (expressly recognizing that "other reasons" may exist for granting compassionate release), see Note 1(D), § 1B1.13 Note 1(D) (recognizing that extraordinary and compelling reasons exists "other than, or in combination with, the reasons described in subdivisions (A) through (C)."). Here, Ricks' high susceptibility to COVID-19 falls within the purview of this catchall. Moreover, courts have noted that while § 1B1.13 provides "helpful guidance" for determining what constitutes an extraordinary

and compelling reason to warrant a sentence reduction, the inquiry does not end there. Rather, district courts have the freedom to shape the contours of what constitutes an extraordinary and compelling reason to warrant compassionate release. Given the highly infectious nature of COVID-19, the inability in a facility like BOP to practice any of the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and the fact that Ricks suffers from ailments that have already been identified as "high risk," this Court should find that Ricks' legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release.

A recent letter by fourteen U.S. senators of both parties underscores this position. Writing to U.S. Attorney General William Barr and BOP Director Michael Carvajal, they stated: "[We] urge you to take necessary steps to protect [inmates in Federal custody] particularly by using existing authorities under the First Step Act (FSA). . . . We have reviewed the Federal Bureau of Prisons (BOP) COVID-19 Action Plan, which . . . notably does not include any measures to protect the most vulnerable staff and inmates. . . . [I]t is important . . . that the most vulnerable inmates are released or transferred to home confinement, if possible." And as the Second Circuit noted about COVID-19 in a unanimous recent opinion, "The impact of this recent emergency on jail and prison inmates, their counsel . . . , the United States

36

Attorneys, and the BOP, including the individual Wardens and the personnel of each facility, is just beginning to be felt. Its likely course we cannot foresee. Present information strongly suggests, however, that it may be grave and enduring." *Fed. Defs. of New York, Inc.*, 2020 WL 1320886, at *12.

Finally, in the last few months, other jails and prisons have already started to proactively release elderly and sick inmates who are at high risk of infection, as well as releasing as many nonviolent offenders as possible in an effort to reduce the incarcerated population and thus reduce the risk of spread. For example, on March 25, 2020, New York City announced that it would release 300 inmates from Rikers Island. Approximately 1,700 inmates have been released from Los Angeles County Jails, and 1,000 inmates are to be released from New Jersey jails. Therefore, while COVID-19 remains an unprecedented emergency, many states (and politicians) have recognized that they have a duty to flatten the curve inside incarcerated spaces. So, too, should this Court.

### 3. Courts Have Granted Compassionate Release in Light of the Instant Pandemic.

Courts in the Southern and Eastern Districts of New York have granted compassionate release based on COVID-19. See *United States v. Wilson Perez*, No. 17 Cr. 513 (AT) (S.D.N.Y. Apr. 1, 2020), ECF No. 98, (granting release based on

health issues and finding court could waive exhaustion requirement; government did not object based on defendant's medical conditions); *United States v. Mark Resnick*, No. 12 Cr. 152 (CM) (S.D.N.Y. April 2, 2020), ECF No. 461 (granting compassionate release because of defendant's age and medical conditions in light of COVID-19); *United States v. Eli Dana*, No. 14 Cr. 405 (JMF) (S.D.N.Y. Mar. 31, 2020), ECF No. 108 (granting compassionate release motion, where government consented, because of defendant's age and medical conditions and the risk posed by COVID-19); *United States v. Damian Campagna*, No. 16 Cr. 78 (LGS), 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020) (granting compassionate release sentencing reduction to defendant convicted of firearms offenses based on defendant's health and threat he faced from COVID-19; government consented to reduction and agreed health issues and COVID-19 were basis for relief); *United States v. Daniel Hernandez*, No. 18 Cr. 834 (PAE) (S.D.N.Y. Apr. 1, 2020), ECF No. 446 (granting compassionate release after BOP denied the request and converting remaining sentence to home confinement).

So, too, have courts across the country. See *United States v. Andre Williams*, No. 04 Cr. 95 (MCR) (N.D. Fla. Apr. 1, 2020) (granting release based on defendant's health and COVID-19); *United States v. Teresa Ann Martin*, No. 18 Cr. 232 (TOR) (E.D. Wa. Mar. 25, 2020), ECF No. 834 (waiving any further exhaustion attempts as

futile and granting compassionate release based on defendant's health issues and COVID-19 pandemic); *United States v. Jeremy Rodriguez*, No. 03 Cr. 271 (AB) (E.D. Pa. Apr. 1, 2020), ECF No. 135 (finding court has independent authority to determine "extraordinary and compelling" reasons and granting compassionate release based in part on defendant's health and COVID-19; no exhaustion issue because 30 days had passed); *United States v. Pedro Muniz*, No. 09 Cr. 199 (S.D. Tex. Mar. 30, 2020), ECF No. 578 (granting compassionate release based on health conditions that made inmate susceptible to COVID-19); *United States v. Samuel H. Powell*, No. 94 Cr. 316 (ESH) (D.D.C. Mar. 27, 2020), ECF No. 97 (granting compassionate release for 55-year old defendant with respiratory problems in light of outbreak, without waiting for 30 days or other exhaustion of administrative remedies through the BOP); *United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT) (D. Mass. Mar. 17, 2020), ECF No. 642 (granting defendant's emergency motion based on COVID-19); *US v. Foster*, No. 1:14-cr-324-02 (M.D. Pa. Apr. 3, 2020) ("The circumstances faced by our prison system during this highly contagious, potentially fatal global pandemic are unprecedented. It is no stretch to call this environment 'extraordinary and compelling,' and we well believe that, should we not reduce Defendant's sentence, Defendant has a high likelihood of contracting COVID-19 from which he would "not expected to recover." USSG §§ 1B1.13. No rationale is more compelling or

extraordinary."); *US v. Powell*, No. 1:94-cr-0316-ESH (D.D.C. Mar. 24, 2020), Recommendation, Dkt. 94 (Court recommendation to BOP to immediately place defendant, who is 55-years old and suffers from several respiratory problems (including asthma and sleep apnea) into home confinement to serve the remainder of his prison term); *United States v. Watkins*, Case No. 15-20333 (E.D. Mich. Jul. 16, 2020), granting compassionate release to prisoner whose only underlying condition was previously-treated latent TB; and *Singh v. Barr*, No. 20-CV-02346-VKD, 2020 WL 1929366, at *10 (N.D. Cal. Apr. 20, 2020) (granting release from immigration custody for petitioner with latent TB, hypertension, and obesity); and *United States v. Gerard Scparta*, No. 18 Cr. 578 (AJN), ECF Dkt. 69 (S.D.N.Y. Apr. 19, 2020). In *Scparta*, Judge Nathan granted a compassionate release motion of a 55-year old defendant who suffers from high blood pressure, high cholesterol, sleep apnea, and hypertension. The court found that it could waive § 3582(c)(1)(A)'s 30-day waiting period and hear the motion, and describes USP Butner's "Kafkaesque" "14-day quarantine" process—which is neither a true "quarantine" nor actually limited to 14 days—before releasing inmates to home confinement.

### 4.   Ricks' Remarkable Rehabilitation

It is essential to also note that since Ricks' incarceration began, he has taken numerous steps to attempt to improve himself in "post-conviction rehabilitation."

Throughout the time he has spent in prison, Ricks has worked long and hard and diligently at his rehabilitation. Hence, there can be no genuine safety concerns on his release. His extraordinary rehabilitation shows that he is ready for re-entry.

Ricks urges the Court to consider the following *Redd* case citations:

- *United States v. Carpenter*, 2:14-CR-00309-TLN, 2020 WL 5851129 (E.D. Cal. Sept. 30, 2020) in which the court initially denied the defendant's request for compassionate release but later granted on a motion for reconsideration after observing that cases within defendant's facility had increased and that the defendant was herself diagnosed with COVID-19.

- *United States v. Belanger*, 1:15-CR-00072-JDL, 2020 WL 5351028 (D. Me. Sept. 4, 2020), which granted release for a defendant at risk of severe COVID after he had served approximately 30% of a 132-month sentence.

- *United States v. Grant*, 16-30021-001, 2020 WL 4036382 (C.D. Ill. July 17, 2020) which specifically recognized that osteomyelitis may pose a serious health risk despite not being specifically named by the CDC as a COVID-19 risk factor.

- *United States v. Pabon*, 458 F. Supp. 3d 296, 299 (E.D. Pa. 2020) which granted defendant compassionate release after serving 14 months of a 46-month sentence because "continued incarceration might interfere with his ability to get needed medical care" for hypertension, diabetes, and other medical conditions.

And

- *United States v. Crowe*, 980 F.3d at 1102 n.6 (holding that inmate's prior exposure to tuberculosis "could be considered an extraordinary and compelling reason for compassionate release" because it "put him at risk of contracting the virus" or "serious

long-term health problems" if he had already contracted it). Courts considering the issue post-*Jones* have agreed. See, e.g., *United States v. Rucker*, No. 17-20716, 2020 WL 7240900, at *2 (E.D. Mich. Dec. 9, 2020) (HIV and asthma) (citing *Jones*, 980 F.3d at 1102 n.6); *United States v. White*, No. 18-20183, 2020 WL 7240904, at *3 (E.D. Mich. Dec. 9, 2020) (BMI of 45.9) (citing *Jones*, 980 F.3d at 1102 n.6); *United States v. Crowe*, No. CR 11-20481, 2020 WL 7185648, at *3 (E.D. Mich. Dec. 7, 2020) (latent tuberculosis, hyperlipidemia, obesity).

- Section 1B1.13 has not been updated to reflect pursuant to the 2018 First Step Act, hence, defendants now have the ability to bring such motions directly. This anomaly has given rise to a debate concerning whether and to what extent § 1B1.13 applies to motions filed by defendants, with several circuits recently holding that § 1B1.13 applies only to motions filed by the Bureau of Prisons, and not to motions filed by defendants on their own behalf. See *United States v. McCoy*, Nos. 20-6821, 20-6869, 20-6875, 20-6877, 2020 WL 7050097, at *6-7 (4th Cir. Dec. 2, 2020); *United States v. Jones*, No. 20-3701, 2020 WL 6817488, at *8-9 (6th Cir. Nov. 20, 2020); *United States v. Gunn*, No. 20-1959, 2020 WL 6813995, at *2 (7th Cir. Nov. 20, 2020); *United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020).

Factoring in Ricks' rehabilitation and impeccable conduct in prison, his continued risk to the public if released appears to be markedly reduced, particularly when tempered by significant rehabilitation. Given his personal rehabilitation, and deeply felt remorse, the Court must conclude that deterrence and public protection are no longer strong § 3553(a) factors weighing in favor of continued detention.

Under 18 U.S.C. § 3582(c)(2), to modify Ricks' sentence, taking into account the advisory nature of the guidelines after *Booker* and the considerations set forth in

18 U.S.C. § 3553(a). The court should find that a sentence of time served is sufficient, but not greater than necessary, and accounts for the sentencing factors the court must consider pursuant to 18 U.S.C. § 3553(a), specifically deterrence, protection of the public, and respect for the law.

Additionally, Ricks also contends that evidence of his post-sentencing rehabilitation warrants a reduction. More so, his BOP record does not show that he is violent or a threat to public safety.

Finally, the combination of factors, health conditions, COVID-19 risk, as well as post-sentencing rehabilitation, and the changing sentencing landscape justify granting compassionate release to Ricks. More so, his BOP record does not show that he is violent or a threat to public safety.

If granted compassionate release, Ricks will reside with his family– where he will be able to isolate himself and take the same precautionary measures that all Americans are taking: frequent hand washing, sanitizing his living space, and seeking medical care if necessary. None of these precautions are available in prison. Ricks will receive medical care from his doctors, who are located near their home. Further information about these release plans upon request.

## IV. **CONCLUSION**

For the above and foregoing reasons, Ricks prays this Court would consider his Motion for Compassionate Release/Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) and the First Step Act of 2018, based upon the fact that he has exhausted available administrative remedy and he has met the "extraordinary and compelling reasons" requirement.

Respectfully submitted,

Dated: September 3, 2021

TODD RICKS
REG. NO. 83035-180
FCI BASTROP
FEDERAL CORR. INSTITUTION
P.O. BOX 1010
BASTROP, TX 78602
Appearing *Pro Se*

44

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September _3_, 2021, a true and correct copy of the above and foregoingMotion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) and the First Step Act of 2018 was sent via U. S. Mail, postage prepaid, to Ashley Chapman Hoff, Assistant United States Attorney at United States Attorney's Office, 816 Congress Ave., Suite 1000, Austin, TX 78701.

TODD RICKS